[Crim. No. 5923.   In Bank.   Oct. 5, 1956.]

THE PEOPLE, Respondent, v. JAMES REESE, Appellant.

· Edward T. Mancuso, Public Defender (San Francisco), and Robert Nicco, Deputy Public Defender, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Respondent.

Thomas C. Lynch, District Attorney (San Francisco), and Cecil F. Poole, Assistant District Attorney, as Amici Curiae on behalf of Respondent.

THE COURT.—Defendant was indicted on seven counts for the murder of Georgia Barrett, on December 26, 1955, and of Elizabeth Simpson on December 28, 1955, assault with intent to murder Betty Luke on December 26, 1955, burglary of Luke's apartment, Barrett's apartment and Simpson's apartment, and the rape of Elizabeth Simpson on December

28, 1955. By amendment he was also charged with a prior felony conviction, which he admitted. He pleaded not guilty and not guilty by reason of insanity to the seven counts and the jury found him sane and guilty on all counts, specifying the murders and burglaries as of first degree and making no recommendation as to the penalty for the murders. Judgment was accordingly entered imposing the death penalties for each of the murders and that prescribed by law for the other counts. The case is here by automatic appeal from the judgment and order denying a motion for a new trial. No contention is made that the evidence does not support the judgment. Defendant did not testify.

The evidence shows that about midnight on December 25, 1955, an intruder entered Mrs. Luke's apartment at 950 Eddy Street in San Francisco. A struggle ensued and the intruder demanded, "Your money or your life." Mrs. Luke was hit on the head with a chair and cut with a knife. The intruder fled. His general description fit that of defendant and the latter left a button from his coat on the floor. The intruder took a knife from the Luke's kitchen. Blood of the type of Mrs. Luke's and defendant's was found in the apartment.

On December 26, 1955, at about 6 a. m., a short distance from the Luke's place, Georgia Barrett was slain by a stab in the neck causing her to bleed to death. Before she died, Georgia gave a description of her assailant which was generally that of defendant. In her room was a great deal of blood and the knife that had been taken from the Luke's apartment. Defendant's clothes had blood on them of the type of Georgia's.

About 2:30 a. m. on December 28, 1955, defendant returned to his room at an apartment building at 1230 O'Farrell Street, which was on the same floor as that on which Elizabeth Simpson, a 13-year-old girl, lived with her mother. Elizabeth's mother awakened and finding Elizabeth gone from her bed and blood on the bed, notified the police who, when they came, roused all the tenants but could get no response at defendant's room. They forced an entrance, defendant having pushed a refrigerator against the door, and there found Elizabeth's body. A knife was lying on top of it. Defendant had fled through his window and down the fire escape when he saw the police cars in the street. A short time later he was arrested at the Pacific Greyhound bus depot where he told the police, in reply to why he did it, that he guessed it was the wine; it made him crazy. Elizabeth died from stab wounds

in her neck.   There was spermatozoa in her vagina.   Her
body was mutilated in that her breasts were amputated and
abdomen slashed.   Defendant's ring was found in Elizabeth's
room and a trail of blood ran from there to defendant's room.

Defendant contends that he was deprived of a fair trial in
violation of his constitutional rights to not testify because
his prior conviction of a felony was improperly brought to
the jury's attention.   He asserts that he was entitled to
desist from taking the witness stand; that inasmuch as he
admitted the prior conviction and did not testify, there was
no basis for injecting the prior conviction into the trial and
that he was prejudiced by its presentation to the jury.   He
cites section 1025 of the Penal Code[1] and *People* v. *Beal,* 108
Cal.App.2d 200 [239 P.2d 84], and *People* v. *Cordero,* 92 Cal.
App.2d 196 [206 P.2d 665].

Inasmuch as defendant did not testify and admitted
the prior conviction, it was not proper to bring it to the
attention of the jury, but defendant has not established such
a situation here.   He did admit the prior conviction and did
not testify, nor was there any attempt to compel him to testify.
He refers to the district attorney's argument to the jury,[2]
and the instruction offered by the prosecution and given to
the jury,[3] and the fact that the jury had been sitting as such in

[1] "In case the defendant pleads not guilty, and answers that he has
suffered the previous conviction, the charge of the previous conviction
must not be read to the jury, nor alluded to on the trial."

[2] The district attorney stated: "Do you say 'Send him over to the
penitentiary with a life sentence?' Ladies and gentlemen, a life sen-
tence *is not a life sentence.* A man who goes to the peni-
tentiary with a natural life sentence in California, *becomes eligible for
parole after a period of seven years, or, in some cases, perhaps, a couple
of years more.* We have men on the streets now who have been in
San Quentin for life, and are walking the streets again. Pray God that
none of them ever repeats the crime, but it has happened in these courts
within the last two years, that the same thing has happened. . . ."
(Emphasis added.)

[3] "If, however, after deliberation and consideration of all the evidence
as viewed in the light of the Court's instructions, and if, without con-
sidering the penalty or punishment, you do find the defendant guilty
of murder in the first degree, you must then determine which of the two
penalties—death or confinement in the State Prison—shall be imposed
by you. In this respect, and without in any way attempting to influence
your determination of the punishment, it is proper for you to know
that *even though the defendant should be sentenced to confinement in
the State Prison for life, he will become, under our law, eligible to go
on parole outside the prison walls and enclosures when he shall have
served a minimum term of nine years.* Although a jury may fix the punish-
ment as confinement in the State Prison for life, the legal effect is not

other cases (what kind does not appear) and had had experience. From these things he argues that the jury was in effect told that defendant had suffered a prior conviction, otherwise there would be no occasion for the reference to seven years by the district attorney and nine years in the instruction.

We do not so interpret the record. Nothing was said about a prior conviction and to give defendant's argument force would require the jury to know more law than is to be supposed. It is too remote a possibility that the jury would infer that defendant suffered a prior conviction from the circumstances that they were told of the possibility of parole involved in a life sentence. Defendant agrees that it is proper for the jury to be advised of the possibility of parole in a life sentence where the punishment, life imprisonment or death, is left to the jury. ■ We said in *People* v. *Barclay,* 40 Cal.2d 146, 158 [252 P.2d 321]: "[T]he jury is not allowed to weigh the possibility of parole or pardon *in determining the guilt of the defendant,* and it is therefore error to give an instruction that allows the jury to take into consideration the consequences of a recommendation of life imprisonment in arriving at that determination. . . . To aid the jury in fixing the punishment of the defendant, however, the court may instruct the jury as to the consequences of the different penalties that may be imposed so that an intelligent decision may be made. (*People* v. *Chessman,* 38 Cal.2d 166, 189-190 [238 P.2d 1001]; *People* v. *Osborn,* 37 Cal.2d 380, 384-385 [231 P.2d 850]; *People* v. *Caetano,* 29 Cal.2d 616, 619 [177 P.2d 1]; *People* v. *La Verne,* 212 Cal. 29, 31 [297 P. 561]; *People* v. *Hall,* 199 Cal. 451, 459 [249 P. 859]; *People* v. *Hong Ah Duck,* 61 Cal. 387, 393.) In the Osborn case, the court informed the jury that a recommendation of life imprisonment without possibility of parole would not be binding, thus impliedly answering in the affirmative the question of the jury whether a person sentenced to life imprisonment might be paroled. We stated: 'It is understandable that jurors, who are charged with the duty of fixing the penalty in the event that they find a defendant

---

necessarily that the prisoner will not become eligible for parole. Whether or not a parole is granted to him is within the discretion of the Board known as the Adult Authority, which meets regularly to determine and re-determine what length of time such person shall be imprisoned, unless the sentence be sooner terminated by commutation or pardon by the Governor of the State." (Emphasis added.)

guilty of first degree murder, should be interested in knowing the nature and effect of the penalties which they may impose; and neither reason nor authority indicates that the trial court should be prohibited from enlightening the jurors when questions are asked upon that subject.' (37 Cal.2d at 385.) Recently, in *People* v. *Chessman, supra,* it was held that there was no error in informing a jury that when a person is sentenced to life imprisonment without possibility of parole there nevertheless remains the chance that the defendant will be freed by pardon, commutation, or action of the Legislature. The recent decisions of this court thus establish that a jury may consider the consequences of a recommendation of life imprisonment in determining the punishment of the defendant, although it may not consider the possible penalties in determining the guilt of the defendant." (Emphasis added; see also *People* v. *Byrd,* 42 Cal.2d 200 [266 P.2d 505].)

In this same connection defendant urges that the prosecution intended to bring the prior conviction to the jury's attention in that the jury instruction heretofore quoted as offered by the prosecution contained the words "seven years" or, in the case of one who has been convicted of a felony, perhaps a longer period. The instruction was given as heretofore quoted, however, and we fail to see how the prosecution's intention is important.

As a further attack on the quoted instruction defendant claims that the time would be at least 10 years instead of the nine years under section 3024[4] of the Penal

---

[4]"'The following shall be the minimum term of sentence and imprisonment in certain cases, notwithstanding any other provisions of this code, or any provision of law specifying a lesser sentence:

"'(a) For a person not previously convicted of a felony, but armed with a deadly weapon either at the time of his commission of the offense, or a concealed deadly weapon at the time of his arrest, five years;

"'(b) For a person previously convicted of a felony either in this State or elsewhere, and armed with a deadly weapon, either at the time of his commission of the offense, or a concealed deadly weapon at the time of his arrest, 10 years;

"'(c) For a person previously convicted of a felony either in this State or elsewhere, but not armed with a deadly weapon at the time of his commission of the offense, or a concealed deadly weapon at the time of his arrest, five years;

"'(d) For a person convicted at one trial of more than one felony, and upon whom are imposed cumulative or consecutive sentences the aggregate of the minimum term of which exceeds 10 years, 10 years;

"'(e) Such minimum penalties shall apply only when such possession of a deadly weapon or previous conviction of a felony as above specified has been charged and admitted or found to be true in the manner pro-

Code. The prosecution cited sections 3020, 3040 and 3046 of the Penal Code as authority for the instruction. Section 3046 provides: "No prisoner imprisoned under a life sentence may be paroled until he has served at least seven calendar years. The board shall, in considering a parole for such prisoner, consider all statements and recommendations which may have been submitted by the judge, district attorney, and sheriff, pursuant to Section 1203.1, or in response to notices given under Sections 3022 and 3042, and recommendations of other persons interested in the granting or denying of such parole. The board shall enter on its order granting or denying parole to such prisoners, the fact that such statements and recommendations have been considered by the board. Such statements and recommendations shall, however, be and remain confidential." The prosecution claims that section 3024, *supra*, is not applicable because under paragraph (e) thereof there must have been a charge that defendant was armed with a deadly weapon and such charge must be found true, and no such charge was made here. They also urge that section 3046 is controlling as it specially deals with parole of one imprisoned for life. This last argument appears meritorious for section 3024 is in a portion of the Penal Code dealing with the length of sentences and the fixing thereof while section 3046 is in the group of sections dealing with paroles. The latter group of sections covers all situations in regard to when and how parole may be granted. (Pen. Code, §§ 3040-3065.) In that group appears section 3049 providing: "In all other cases not heretofore provided for, no prisoner may be paroled until he has served the minimum

vided by law and the minimum terms specified in paragraphs (a) and (b) shall not apply in those cases wherein the property stolen or sought to be stolen is an animal or animals and the manner in which such property is taken or attempted to be taken constitutes the crime of theft and the weapon used during the commission thereof is not used or intended to be used against a person or to resist arrest.

"(f) The words 'deadly weapon' as used in this section are hereby defined to include any instrument or weapon of the kind commonly known as a blackjack, slung shot, billy, sandclub, sandbag, metal knuckles, any dirk, dagger, pistol, revolver, or any other firearm, any knife having a blade longer than five inches, any razor with an unguarded blade and any metal pipe or bar used or intended to be used as a club.

"(g) For the purpose of determining whether or not a conviction for a public offense in another jurisdiction is a previous felony conviction under this section, the word 'felony' is defined as a public offense which, if committed in this State, could have been punished as a felony under the laws of this State. Where such an offense is punishable in this State either as a felony or as a misdemeanor, it may be deemed a felony for the purposes of this section." (Pen. Code, § 3024.)

term of imprisonment provided by law for the offense of which he was convicted . . . provided, that any prisoner, received on or after January 1, 1948, at any state prison or institution under the jurisdiction of the Director of Corrections, whose minimum term of imprisonment is more than one year, may be paroled at any time after the expiration of one-third of the minimum term. In all other cases he may be paroled at any time after he has served the minimum term prescribed by law.'' Thus even if section 3024 applies, parole may be granted after one-third of the minimum term in section 3024 has expired. Moreover the matter of one or two years is not of such importance as to prejudice defendant. The main thing is that he would have been subject to parole in the event of a life sentence and defendant had argued to the jury that defendant would never be paroled if he were given a life rather than a death sentence.

Defendant claims that evidence of the mutilation of the body of Elizabeth Simpson was given which served to inflame the jury. He points to the testimony of Drs. Warrens, Turkel and Moon and Police Officers Nelder and Higgins that her breasts were amputated and abdomen cut from the vagina to the naval. This was done after Miss Simpson was dead from a stab wound in the neck. Defendant objected to this testimony but in other instances it was admitted without objection by him, which may be explained by the clear indication by the court that it would not sustain his objection. His main complaint is that photographs and other evidence showed the condition of Miss Simpson's body and the additional evidence adverted to by him served no purpose except to inflame the jury.

It is said in *People* v. *Burns,* 109 Cal.App.2d 524, 541 [241 P.2d 308, 242 P.2d 9], cited by defendant: ''In California it has been held that photographs of this kind are admissible even though they show marks of the incisions for the autopsy (*People* v. *Gomez,* 209 Cal. 296 [286 P. 998]), and even though they might inflame the minds of the jurors against the defendant. (*People* v. *Burkhart,* 211 Cal. 726 [297 P. 11].) However, in every case in which they were admitted (with the possible exception of the Burkhart case, *supra,* where the 'evidence points positively and unmistakably to the defendant as the perpetrator of the homicide' (p. 730)), there was some necessity for exhibiting the wound or wounds to the jury. In *People* v. *Elmore,* 167 Cal. 205, 212 [138 P. 989], the court pointed out that photographs

should not be offered or admitted for any purpose other than to help the jury. The admission of photographs of this type is within the sound discretion of the trial court. Surely, there is a line between admitting a photograph which is of some help to the jury in solving the facts of the case and one which is of no value other than to inflame the minds of the jurors. That line was crossed in this case.'' But in that case the photographs were particularly horrible because of the incisions by the autopsy physician rather than that caused by defendant.

█ Relevant evidence of the condition of deceased's body is admissible although it may be gruesome and possibly inflammatory. (*People* v. *Isby,* 30 Cal.2d 879 [186 P.2d 405]; *People* v. *Guldbrandsen,* 35 Cal.2d 514 [218 P.2d 977]; *People* v. *Dunn,* 29 Cal.2d 654 [177 P.2d 553]; *People* v. *Burwell,* 44 Cal.2d 16 [279 P.2d 744]; *People* v. *Cavanaugh,* 44 Cal.2d 252 [282 P.2d 53]; *People* v. *Sutic,* 41 Cal.2d 483 [261 P.2d 241].) And cumulative evidence on the subject may be proper (*People* v. *Dunn, supra,* 29 Cal.2d 654, 659; *People* v. *Reed,* 38 Cal.2d 423 [240 P.2d 590]). Here the evidence was clearly relevant to intent, motive and the circumstances of the killing and we cannot say that it added appreciably to the other evidence to the same effect.

We have examined the entire record in this case. It discloses a career of crime almost unparalleled in the history of this state. It also discloses that defendant was accorded a fair and impartial trial before a jury presided over by an able and experienced trial judge. He was ably defended by the public defender who was zealous in seeking to protect and safeguard all of defendant's rights. We find no error prejudicial to the rights of the defendant. The evidence of guilt of each and all of the crimes charged is overwhelming.

The judgment and order denying a new trial are affirmed.

Appellant's petition for a rehearing was denied November 2, 1956.